Good afternoon, ladies and gentlemen. This is the time for the campaign unbanked. In the case of the United States v. Jernigan, Judge Gould is not able to be with us today to participate, but he will participate in the decision by listening to the tapes. And I understand parties are ready to proceed. And so the counsel is going to give the floor. Thank you. My name is Tom Hoytel. I'm an attorney from Phoenix representing Rachel Jernigan in this case. I was not the lawyer who handled the case in the district court on the motion for a new trial. I wrote the brief. So that was my partner, John Hanna, who, after the briefs were submitted and before oral argument in the panel, before the panel, he was appointed to the superior court of Maricopa County. And so I took over the case at that point. The legal issues in this case, I'd like to restrict my argument to the Brady issue in this case. The Brady issue in this case has to do with the nondisclosure of bank robberies by a person fitting the description, matching the description of the defendant in the same general vicinity during the same period of time which were not disclosed to the defense prior to trial. The standard of review on that issue is de novo review. The legal standard is information known to the government but not disclosed. Clearly, this information was known to the government because the FBI agent ---- Mr. Hoytel. Yes, Your Honor. You say the standard of review is de novo as to the legal issues. And as to any factual issues, is that also de novo or is it clear error? Well, the legal issue in this case is the question of materiality, whether there would be a reasonable probability of a different result. I think that's a de novo standard of review. I don't know that there are factual findings by the ---- the only factual finding that the district court made in this case was that it did not believe that the defendant, Rachel Jernigan, was similar to, looked similar to the person who eventually was apprehended for the bank robberies that were not disclosed. The factual finding that Jernigan wasn't Gallegos and Gallegos wasn't Jernigan. Well, that's a factual finding that they did not look alike. I'm not sure that that went so far as saying that Jernigan was not Gallegos. I mean, it was a factual finding that they did not look alike. There were two different people, certainly. We all ---- clearly there were two different people. That was a factual finding. They didn't look alike. And as to that, finding the scope of review would be clear error, correct? Well, I have a different view. If I might, I'll get to that. I have a different view of whether ---- Do you have a case that says your view is correct? I have a different view of whether that is a relevant consideration in this particular appeal. But do you have a case that says that that type of question is reviewed for de novo rather than clear error? I don't have a case on that issue. I do not, Your Honor. But the ---- I thought your position was that that does not matter for Brady. That fact does not matter. In terms of Brady analysis, it matters. However, you agree it matters for the Rule 33 analysis. For the Rule 33 analysis, it may have some relevance. So let's be honest, the question is perfectly germane in the case. Your position is just that that fact doesn't matter for the argument you want to focus on. That's correct, Your Honor. And I gave Mr. ---- well, I'll come to that. I'll come to that in a second, Your Honor, with that issue. Let me just cover the legal standard here. Brady is not confined to evidence that affirmatively proves the defendant innocent. That's not what we're talking about here. And that's part of the issue of why I don't think that the district court's determination that Rodriguez-Gallegos does not look like Rachel Jernigan is not important. Well, it wasn't known before trial, right? Pardon me? It wasn't known before trial how closely the two resembled. It wasn't known before trial. It was not known before trial. So it can't possibly be relevant to a Brady analysis because that's limited to what the prosecution knew. That's correct. Is it your position that the photographs from the surveillance photo, the surveillance of both bank robberies, the Gallegos bank robbery and the Jernigan bank robbery, were not known before trial? The photographs in the Rodriguez-Gallegos matter were certainly in existence before trial, but were not known to Jernigan or her counsel. No, but they were known to the Mr. Richard, the FBI. That's correct. And he compared the two photographs before coming to his conclusion that this was not Brady testimony. Well, there's a question as to what he did. He knew that Rachel – he has testified after the fact, yes, that he – they had meetings and that they tried to determine who may have been involved in the bank robberies in November of 2000, November 28th and November 30th. However, the point is he never considered whether those particular bank robberies might have been committed by the same person who committed the bank robbery on September 20th of 2000. But in his testimony on the post-trial Brady motion, he did say that he had considered one person as not being the other because of difference in M.O., because of difference in many things, and also because he compared the photographs. Well, yes. After the fact, that's what he said. We don't have any knowledge that he did before the fact. That's what he said he did during the time that they were investigating him. But I would submit that the reason he didn't consider the November 28th and November 30th bank robberies as being relevant to the September 20th bank robbery is because Jernigan was already in custody. He had charged that particular case, and he wasn't even considering the possibility that the person whose description matched completely was the person on the November 28th and November 30th robberies. The person whose description matched completely could be the same person who had committed the September 20th bank robbery. Counsel, for purposes of the Brady, do we have to take it as conclusive that Jernigan is the robber who committed the November and December robberies? No. Rodriguez-Gallegos. I'm sorry. I'm sorry. Gallegos. That issue arose in the post-trial motion hearing, and the testimony was those particular accounts were dismissed. The November 28th and the November 30th, 2000 bank robberies were dismissed in connection with a plea agreement that Rodriguez-Gallegos entered into with the government when she pled guilty to the December 2001 bank robbery. However, Agent Richard testified that he had, quote, cleared paper with those particular bank robberies, November 28th and November 30th, and that Rodriguez-Gallegos had admitted to those particular bank robberies. Now, the problem, of course, is he never – he never – there's no evidence in the record that he had asked Rodriguez-Gallegos about any other bank robberies, including the September 20th bank robbery for which Jernigan was charged and convicted, and the October 11th and October 25th bank robberies for which he was charged with, but never tried them. But you said that he had never considered before the trial whether Gallegos had done the September robbery, correct? That's correct. Because she was in custody. But to – at page 82 and 83 of the transcript of the hearing post-trial, before the judge on May 12th, 2004, he said, the court, so you're saying again from a credibility standpoint, at least, Mr. Richard, that a bank robbery right across the street in a 30-day period robbed by what is variously described as a Hispanic woman, 5 feet plus or minus, 125 pounds, Hispanic-looking, long hair, with or without a gun, you wouldn't consider, gee, that might be the same person, the witness? Yes, sir. I don't want to minimize what we would have done. Certainly, we would have given that thoughtful consideration. But after we reviewed the facts of the case or the facts of the cases and the descriptions, we would have made a thoughtful deliberation in conjunction with the police departments associated with those investigations. And at no time after we reviewed the facts in the case, as in the photographs and the descriptions, did we ever conclude anything but those sets of robberies, the first three, and those two were committed by two different robbers. Well, that's what he said in 2004. I submit that in 2001, he was not considering the September 28th, the earlier bank robberies as having been committed by the same person who committed the November 28th and November 30th. That testimony that was just read was sort of all in the hypothetical anyway. Pardon me? That testimony that was just read was all in the hypothetical. That's correct. He didn't actually say we sat down and did this. Well, he does say at one point in the transcript that he did have meetings with the Bank Robbery Task Force, and they would look. And of course, what they would do is try to determine which bank robberies fit together. Right. But did he say that he considered the question whether this evidence was such that it should have been given to Ms. Jernigan? Did he ever say he considered that question? He never considered that. I submit that he did not consider that because Jernigan was already in custody at the time, the November 28th and November 30th. And he never said he considered it. Well, his position was, as Judge Bea has stated, in 2004, his position was that these were two separate individuals. That was after the fact. Well, assuming that's a bona fide determination by the agent, what obligation does he have to go beyond that? If he's got someone in custody and this person, in a bona fide basis, is not the same person, that's the end of it, is it not, from a Brady point of view? Well, I would submit, Your Honor, when the descriptions are so close, so close, witness descriptions, female, Hispanic, maybe Asian, short, very short, 5 feet or less, 150 to 130 pounds, dark, maybe shoulder length, pulled back. This is from September 20th. And I would submit that he did not consider that because Jernigan was already in custody   Well, assuming that's a bona fide determination by the agent, this person, in a bona fide basis, may have had acne, kind of pockmark complexion, denim shirt with T-shirt underneath and blue jeans, handwritten demand note on folded white paper that warned her to tell her not to set off the alarms. Is the test the government agent's objective determination whether something is exculpatory or whether he thinks it exculpates? No, Your Honor. I think it's a... What difference does it make what determination the agent made? It's an objective test. It should be on whether it's exculpatory. It's an objective test based on the fact that we submit these questions to juries. So the issue isn't what the person thought. It's what somebody might conclude because we don't want the agent deciding if it was the same person. We want the jury deciding. So what's the relevance of his subjective view about whether it's the same person? Well, I don't believe that his subjective view of it is what governs. It's the objective facts of how closely related these particular descriptions were and how one bank robbery, the 920 bank robbery being across the street from the 11th. But what is the rule? I'm sorry. Does your position turn on the oddity of these descriptions? I mean, suppose the description had been, you know, there's a 6'2 white man, you know, wearing jeans. Would that have created an obligation? That would be the more generic type of description that might not create an obligation. Here we have a female. Number one, you have the statistics from the FBI. Females, 5 percent or maybe a little more, maybe 6 percent of bank robbers are females. You have a Hispanic female. Again, a very small percentage Hispanic bank robbery defendants. So the uniqueness of this particular alleged perpetrator. It must have been of unusual height. And the unusual height, the 5'5", the pockmarked face, the same thing on November 28th, the little acne, creamy brown skin, handwritten demand note the same, 25 to 30 years old. The virtual identity of these particular descriptions, coupled with the uniqueness of the fact that this is a Hispanic female. Mr. Heidel, what is the rule that you would have this Court apply to give guidance to FBI agents in the future as to whether, unlike this case, they have some sort of a duty to come forward with this information? What's the test? What's the duty? How do we determine whether or not there's a duty? Well, the duty stems from the Brady obligation to disclose exculpatory information. And the test to determine here is whether there's a reasonable probability that the result would have been different, undermining confidence in the outcome. Well, then the similarity may or may not determine that. Isn't that right? Well, when you have such close descriptions that and bank robberies that occur across the street from each other with descriptions that are virtually identical, that, it seems to me, should strike anyone as being the type of evidence that would undermine confidence, and a bank robbery on November 28th committed by somebody who is clearly not Jernigan. That would undermine confidence in any verdict in this case, any guilty verdict. And that's the type of rule. Rodriguez-Giagos? No, but there was nothing that tied Jernigan to the September robbery. Well, I don't believe that the confidence in the verdict should be undermined simply because there was description out there that was similar. All of the M.O. was different. Between the two, without anything to link Rodriguez to the former one. I mean, that is an extension of existing law. Well, you mean, I don't quite understand nothing to link her. Well, he wasn't known at the time. What was known was that there were two other bank robberies, slightly different M.O.s, or considerably different M.O.s, depending on how you want to look at it. But with a very similar description of the person. And nothing else. I mean, no name, no way to link or connect her to the prior bank robbery. Her presence in the city, even the city or the area at the time. Nothing. There's no other link. That's enough? Yeah. Well, we don't have that information. After Rodriguez-Giagos was arrested in December, there was no investigation of whether she was present in that area, whether she was. There's no indication. We're looking at the Brady Crawford hypothesizing it was made at the time. That's all you know. Just know a couple other bank robberies. At that time, that's correct. That's sufficient to undermine confidence in the verdict. These descriptions are so similar, and when the method of the bank robbery is so similar and when they're in close proximity. Well, the method of the bank robbery is generic. And to the extent that you look at the method, one was totally silent and the other was talked verbal. Well, not entirely. The October 25th bank robbery that was charged against Jernigan, there was some statement made by the election office. Let me ask you this. The same FBI office was on all of these. Same agent. Same agent, yeah. And the same prosecutor? No. It was not the same prosecutor. The same office. The same office, yes. The same office. And so that agent, he had these descriptions that we've been talking about. That's correct. So you're thinking it's rung the bell, huh? Do you think we look beyond the description? Do we also presumably look to the, at least on the effect of the nondisclosure, we look to the other evidence of identification? Do we take that into account on materiality as well? Well, that's the issue on whether there's a reasonable probability of a different  Well, I know that's, that I know. What I'm asking, my question, let me be sure it's clear, is in response to Judge Reimer's concern, do we take into account the strength on the materiality issue? Do we take into account that there were other identifications besides just her description? In other words, that people had identified her. If there were a video camera that had her on tape, does the fact, clearly on tape, does the fact that some other woman, another bank robbery happens while she's in custody and it's almost a, let's say it's a perfect match on M.O. and you have the similarity of description, how would that weigh into the analysis then as to whether it's material? Well, I think that goes to the district court's notion that they don't look alike. That might have some relevance on the issue of the new trial motion, whether we could show that it was likely to be an acquittal. It doesn't have relevance to the Brady motion, which only requires some undermining of conscience in the outcome. In the Brady motion, you have to consider not only the similarity of the identification, but it's a cumulative matter. It's all the evidence that the FBI had, which would include the photographs taken from the surveillance tape, would it not? Yes, it would. You would have to consider that, Your Honor. But I cited in our petition for rehearing an article by Dr. Wells of Iowa State on eyewitness identification, which addresses a number of the issues there. I'm not talking about eyewitness identification. I'm talking about the two photographs from the video cameras at the two banks. That's not eyewitness identification. Oh, yes, yes. To the extent that they're very good, yes. You have a video from the November 28th robbery. You have the video from the September 20th robbery. And you have stills. And there were stills introduced at the hearing. Well, the videos are actually still photographs at different sequences. Yes, you have those. But to the extent, obviously, there's disguises. There's a cap on the alleged robber in the September 20th. The pictures are not that clear on exactly what this person looks like. Judge Carroll in the district court came up with his conclusions. But the pictures are simply not that clear. We give to Judge Carroll's conclusion. As I said before, that conclusion is not pertinent on the Brady case. But even if they were pertinent, how is that a fact-finding? People look alike. I mean, people mean a huge myriad of things by that. I mean, if you made a finding, do we take this to be a finding that no reasonable person would confuse them, or what? What is the finding? Well, the finding is they don't look alike. They don't look alike, whatever that means. That doesn't advance the issue, it doesn't seem to me, because the question is, had they produced the Brady, had they said, oops, this is Brady, what exactly would they have come up with? I think that would help. Well, what they would have come up with at that point would have been the video of November 28th, the descriptions of the bank robbers on November 28th and November 30th, the descriptions that matched almost identically the descriptions of the bank robber on September 28th. At that point, as Your Honor pointed out, Ms. Rodriguez-Gallegos was not, had not been apprehended at that point. So the issue would have been. So the actual perpetrator of the 28th and her pictures would not have been known except as captured in this November 28th video. That's correct. The actual perpetrator. Which is clearly not your client, but then it's clearly not your client because your client was in jail at the time, right? That's correct. And so they would have had that. They would have had the similar descriptions. And we could have, we could, the defense could have at that point attacked the thoroughness of the government's investigation because it had chosen not to associate those particular bank robberies. Jernigan could not have been responsible for those bank robberies, yet the descriptions matched perfect, almost identically, the descriptions of the bank robber in the September 20th video. Play it down for me. What would you have done with that? Or what would your partner have done with that? Well, number one, it could have placed third-party culpability. That is, that is, that the actual robber in the Jernigan, in the Jernigan-charged robbery, the September 20th robbery. By introducing the videos from the November 28th robbery or by cross-examining the agent? Well, both cross-examining the agent on his failure to investigate whether the person who was involved in the November 28th and November 30th robberies had been, had been the perpetrator of the September 20th robbery, and questioning the agent on that and introducing the video evidence to show this other person, who could not have been Jernigan, committing a very similar type of robbery. What about cross-examining the eyewitnesses? Well, yes. I mean, the cross-examination of the eyewitnesses, the issue was that eyewitnesses were never asked if the person depicted in the November 28th video was the person who they thought was the perpetrator of the September 20th robbery. The jury would have been able to compare, as we can, whether or not the November video images are the same person or not in the September images. Yes. But for the Brady analysis, we don't show that. We don't have to show that there would be a likelihood of acquittal. All we have to show is that. I understand. But that's what they would have at least had that to compare. If the. They would have made the determination that Judge Carroll did, one way or the other. If the videos, if the videos were admitted. Obviously, you're emphasizing the Brady issue. And I'm taking that, that you think that the Rule 33 motion is a little steeper hill to climb for you? Yes, because we have to show a likelihood that there would be an acquittal, absolutely. And that's the more difficult, difficult burden in this particular case. Because of the standard or also because there was more information at that point, i.e., the actual person now existed and could have been compared? Well, that changes the calculation as well at this point. When we have, at this point, we have somebody who, according to the FBI, has come forward and admitted responsibility for the November 28th robbery. And one person. Similar to the descriptions have to be to trigger the disclosure requirement, do you think? Well, I think they have to. The key point of this one is that we have a female Hispanic. It seems to me that's the key point. When you have 5 percent of bank robberies. So tall or short, if it's a Hispanic female, they would have had to disclose that? Well, I think that's the key. Once we get beyond that, though, it matches up in many, many other respects. I'm not sure exactly how many respects it has to coincide. Suppose the FBI apprehends a white male bank robber, do they then have to disclose to the defense every other white male bank robber in the past? Not without some – I wouldn't think so, but not without some additional fact. But a 6.2 white male, same neighborhood. Right. So if you have a 6.7 male, it would have to be disclosed.   And a 6.8 male would have to be disclosed. If they had dark hair, pock marks, no tattoos. Right. So you're saying it has to be uncanny? That would be something that would be disclosed. Yes. When the descriptions match up so much as these do, that's going to be disclosed. Certainly a 6.8 male would have to be disclosed. Well, you mean if it's an unusual, somebody who's unusual height. An unusual height, yes. What about the guns? What about the guns? Yes. Does it apply in Los Angeles as well as Mesa? Well, I would say so, Your Honor, in a – if bank robberies are across the street. I wanted to – I'm sorry. I wanted to know about the gun and the vehicle, because there's some correlation between a description of a vehicle on two robberies, one of which I think is later attached to Rodriguez. Yes, the November 30th. And Rodriguez Gallegos is – has a gun. That's correct. On the November 30th. All right. And they don't ever find a gun on your client, right? Never find any weapon, no. What – do you make anything of the fact that I guess your client was shoplifting shortly after she supposedly robbed and got 5,000 bucks? Well, that is her prior record was. Well, I know. But, I mean, I guess if I were, you know, a defense attorney would say, well, how could she be the robber if she already had 5,000 bucks, unless she's a kleptomaniac or something. But also, did – I thought that one of the eyewitnesses to the Jernigan robbery said that she looked down and saw a gun. That they – she looked at it very closely and with her eyes she told me. That's the September 20th. Right. So she said that somebody did say they saw a gun. That's correct. Right. Whether one was found or not. Whether one was found. That's correct. Well, I mean, that cuts in your favor. A gun was found, as I recall, a gun was found after Rodriguez Gallegos was apprehended on November 30th. Judge Callahan asked about the vehicle. Right. There was a vehicle noticed by one of the witnesses, a black 4Runner SUV, in the November 30th robbery. And then there was a similar vehicle noticed in one of the October robberies that was alleged to be associated with Jernigan. But the FBI never followed up on that. Your position is that this isn't a very strong case that even though there's a lot of eyewitnesses, they could all be wrong, right? Well, I've cited the – my time is almost up, but I have a lengthy discussion of the eyewitness identification here. The fact that – and I've cited Dr. Wells' article on that. There are a number of factors here that could be at play. Number one is the – It's okay. You don't need to waste your time on that. I'm familiar with that. And number two is that the management process that people pick somebody who looks like – looks most like their memory of the person from the incident and that they'll continue to do that even though the person, the actual perpetrator was not – is not in the photo spread. Counsel, if you'd like to reserve a little time, you're almost up. I'll reserve a few minutes, Your Honor. Okay. Thank you. Good afternoon. Mike Morrissey for the government. The issue in this case is without the evidence of the November 2000 robberies by an unknown bank robber, did Jernigan receive a fair trial? And looking at that, the evidence that Ms. Jernigan did not know about, this Court must also look at the strong evidence against her. Most importantly, the September 2000 video. As the saying goes, the camera doesn't lie. And the November 2000 robberies in no way bear upon the September 2000 video, which is direct evidence of what happened in the bank on that day. What's in that video that you find so telling? I'm sorry, Judge? What's in that video that you find so telling? I find more than two minutes of the robber who the jury found was Ms. Jernigan in line right next to Ms. Hawley, who spent a lot of time staring at her. She – it's not a quick bank robbery. It's not ten seconds to take the money and run. It's over two minutes. The bank robbery itself, Judge, let me say one thing. The last thing the government did was take Ms. Jernigan and bring her before the jury box. She was about three feet closer than I am to this Court, and show her hands. The jury got a very close study of Ms. Jernigan to show that you wouldn't have seen the tattoos. And then she sat down, and I said the government rests. That's how powerful the video is. And the jury asked for the video and watched it during jury deliberation. Explain to me what it was about the video that was so – Because, Judge, there's not a disguise in this video. Most of the government's – You could tell the face. You could recognize the jury. You could look at the video and recognize Mrs. Jernigan. Yes. And I think that's what turned the case. I think Ms. Jernigan standing so close to the jury, it was, in fact, very easy to say, there's no disguise on this woman. This is the woman depicted in this video. I'm not going to – I would never think the person who's on trial is the person who did the crime when she's put in front of the jury box. I'm sorry, Judge? Well, I mean, the question is, you know, you're putting somebody in front of the jury box to say, go here, replicate what we're accusing you of doing. And lo and behold, the jury says, oh, that is the person. No, Judge, I think the point of that was a much closer observation. Whether the jury – Isn't it? Aren't you making the very point that counsel's making for Ms. Jernigan?  And all of a sudden, you find that, wait a minute, there's another bank robber in town across the street, pockmarked face, same size, same, you know, gender, same height. Judge? You don't think the jury might have taken a different look at Ms. Jernigan and your posturing of her and the video and have some uncertainty? No. And let me give a two-part answer to that. I didn't – I couldn't tell the pictures that as distinctively as what you're saying. I looked at both of them. I've got a picture here. And one of them has a widow's peak. The other one doesn't, but the hat's down, so I – you can't see that. And there's also the fact, before you answer, that you should fit in, which is that this person was of a slightly – a somewhat unusual size and shape. And that is an awful lot of what the jury was seeing. In other words, the one thing you could see clearly from the – from the surveillance pictures was the size and shape of this person much more clearly than you could see her face. Okay. Let me say that this Court is in a terrific position to make some of these determinations because somewhat unusually, you have the actual trial exhibits. And so, Judge Kuczynski, the photo you just showed is not an original trial exhibit. And so I would ask this en banc panel to do what the panel did, which was go take the exhibits which are here in San Francisco. We all did it. We did. Okay. Great. But we do not have this jury. I told you. That's why you're giving – that's why you're giving these questions. I was so startled. It's very – what I find it difficult to say is that you argue that you have a strong case. And even if we credit that argument 100 percent, it doesn't really answer the question we have to answer, which is, is there evidence here that would cast doubt? Not whether she would be acquitted, but what would the trial have looked like if you had the other video, the other description in terms of geography, temporal proximity, and facial similarity? So I would appreciate your comment on why you think the trial wouldn't have been any different in terms of casting a doubt or changing the calculus. Okay. Judge, may I answer Judge Fisher's question first? Sure. And any others that you haven't had a chance to. Okay. Judge Fisher, we were talking about physical descriptions. And let me take that on directly. The concept that the description of the November 2000 unknown robber led directly back to the September 2000 robber. Because, in fact, it doesn't. The November 28th victim teller is Emmons. And she describes the robber as having, quote, creamy brown skin, creamy brown skin and a little acne. Two days later – But she also said she was either Hispanic or Asian. Hispanic or Oriental, Your Honor. And I will get to racial descriptions in just a moment. Okay. Two days later, the victim teller from November 30th describes the robber as pot-marked and as having braces. Now, there's no way to reconcile creamy brown skin and pot-marked within those descriptions of November. A little acne. A little acne and pot-marked? I've never heard that. I think that's a very difficult way to reconcile. People who have acne also have other skin. Sure. Creamy. But creamy brown skin? That's a little bit unusual. Then you take the braces. That's a scientific phrase, creamy brown. I don't mean to be facetious, but you're putting a lot of weight on it. I mean, it's brown skin. It's not creamy white skin. I think creamy brown skin is pretty different from pot-marked and would not have led the agent back to September 2000. I also think November 30th, braces. This Court can take, and it said it has. How many witnesses identified braces? Only this. Just that one. From November 30th. From November. Just one witness identified it. The other teller didn't? Correct. So she didn't notice the braces? Correct. And that's not going to help the agent say braces traces back to the September 2000 robber. Wait a minute. I don't understand. You are saying that two witnesses to Gallegos-Rodriguez, one of them didn't pick up on braces. And one did. Because one did. The fact that witnesses in the September robbery didn't pick up on braces, we don't look to the later robbery where the woman didn't pick up on braces either. We're supposed to infer that the robber in September didn't have braces. Well, Ms. Jernigan did not have braces, and we know that because it's Exhibit 24 trial that came in. Right. But we don't know whether the other woman had braces because there was contradictory information on that. And that's my point, Your Honor. I think I've made a little headway because we've moved from the November 2000 descriptions lead directly to the September 2000. They don't have to lead directly to. They have to create some reasonable doubt, a reasonable doubt. They don't have to prove. She doesn't have to prove on a gravy motion that she's going to win. Judge, I completely understand that. But the argument has been made repeatedly that, oh, they were uncanny, these descriptions, that they were direct, that they were on point. Can't you get a small percentage of the population who commit these bank robberies who are women who are Hispanic, whether it's in L.A. or otherwise? I don't know. Maybe that's the evidence. And five feet tall and pockmarked. Five feet tall, but with a skin disorder. Okay. So at least you have some points of reference. Yes. And I'm going to get off the pockmarked because I've made my point. I don't think that it should have told the agent to go back to September 2000. I would also note on modus operandi, the November robber, the unknown robber. Are you saying that if you had been trial counsel, were you trial counsel? I was trial counsel. And you had been brought this by the FBI agent and said, look, I'm an FBI agent. You are the lawyer. And, you know, I've heard of a case called Brady. But you decide. So here it is. You would have said, nah, I'm not going to present it? No, Your Honor. I would have turned it over. Okay. Isn't that pretty much it? Doesn't it say everything you need to say? No. In fact, let me, because. Well, why would you have turned it over? The descriptions were different. This was, you know, the one wore braces. The other one had pockmarks. One had creamy skin. The other one didn't. Why would you have turned it over? You wouldn't have turned it over if it had been a six foot seven man, would you? Let me just say. Would you? If the robberies had involved a guy, a white guy, you know, six foot seven tall man, you wouldn't have done that, would you? You would have told the FBI agent, go, you know. Judge, I would have turned this over. And let me explain why. Six foot seven man, you would have turned that over? If I knew about it, yes. Everything the government. You would have turned any robbery brought to you in the vicinity involving anybody that looked like anything you would have turned over to the defense. Is that what you're saying? The determination, Judge, was not going to be on height. And if I could finish and answer. The government turned over everything it had to the defense in this case. The defense got the entire government report. They got the agent's synopsis. And they used that all very effectively. And let me point that out. That doesn't matter. We're only talking about what they didn't get. We know what the trial looked like for everything they did get. So maybe you can come now back to my question as to why. I wrote it down, yes. Why, in your view, the trial wouldn't have looked any different if you had the additional evidence. Here's why, Your Honor. There's a strong line of cases now. And I will grant you, these are not Brady cases. But this is a familiar fact pattern. Perkins, Brannon, and Perry v. Russian, all in this Court. And here's what this Court has said in Perkins. If the character of the separate offenses is not in any way distinctive, but similar to numerous other crimes committed by persons other than the defendant, no inference of identity can arise. And that's why in the Perkins case, which the district court cited and the panel majority also found, that the September 2000 robbery was a generic robbery. And the November 2000 robberies were also generic. So why would you have turned it over? You said yourself, if it had been presented to you by the FBI agent, you would have turned it over. Why would you have done that? I gave them everything, Judge. I gave them the agent. Well, that's the point. Whatever the government, whatever you as the assistant U.S. attorney had, you normally turn over anyway. You turn over anything. Without regard to its constitutional status under Brady. The case law talks about don't turn it over. Why didn't the FBI agent turn this over to you? You worked with him, didn't you? Oh, sure. Well, no, Judge. I did this trial with him. And Jernigan was charged with September 2000 and two other robberies were attributed to her. I worked on those. I did not work on the unknown robber who becomes Rodriguez-Gallaher. Yeah, but you were with him, with the agent. Yes. You knew about these other robberies? Absolutely not. You didn't? No, I did not, Judge. You would have turned it over, obviously, if you'd known. But now that we really haven't answered the question, because this isn't a generic robbery when you have the gender, the ethnic point, and also geography and description. I mean, that's why it takes it out of those other cases, it seems to me. I still haven't really answered. In your view, obviously you would have made a different argument had this video come in, would you not? Sure. We would have litigated it. That's what would have happened. Well, you'd probably object first, would you not? The other side would have had a whole series more of foundation to do cross-examination of your witnesses, would you not? Your Honor, it would not have come in. And we know this because the district court has already said that he has compared the photos, Exhibits 2 and 3, from the Motion to New Trial from the November. We're not bound by that. I'm a Brady. Your review is de novo. But also he was comparing after Rodriguez was known, right? No. He took only the November 2000 photos, and he found that those were markedly different. So then Rodriguez was the unknown robber, and he found that those were markedly different, this is ER 626, than the September 2000 robber. And that's what could have been done at the time of trial. And Judge Kaczynski, that's why it matters, because Brady is inevitably a hindsight analysis. Judge, you have asked how would the trial have been different. Let me point out what the other robberies don't do. They don't create an alibi for Ms. Jernigan for September 2000. They don't show possibly planted evidence, as in Kyle's. They did not create the possibility of new witnesses. The November 2000 robber was not identified. It would not have impeached the agent. Because the existence of another robber where there is zero evidence of third-party liability does not. Well, there's zero evidence because they didn't have the evidence. If they had what you did have, they might have been. We don't know what they would have turned up. For all we know, they would have turned up that, in fact, she was around at the time. Aren't you charged with knowledge of what the FBI has? Yes. First paragraph of Kyle's and other cases have made that point. So it's the character of the evidence, not the character of the prosecutor. That's right. So you were charged with it. And I don't see what to me is as blatant a Brady violation as I've ever come across. And, you know, we just – there's this tendency lately when we read these cases, maybe we see the wrong ones coming up here, where there's a tendency to not come forward with Brady information. You know that. I mean, they say, well, you know, we'll hold it back, and then the courts will say that it's a harmless error or whatever. But you wouldn't have done that, right? With disrespect for Brady. You wouldn't have done that, what Judge Sprague is suggesting. You would have turned it over. Yes, I would have turned it over. And even if you had – let's say this was not turned over to you by the FBI in this case. Let's say you had gotten – had the judge sign the other case at the same time. And you were working on both cases. You would have seen the connection and turned it over, would you not? Judge, if the connection is that it was favorable to the defense because I can't find a way that it was, and the connection is that it was material, I cannot find that it was. That's not for you to decide. No. And you know who does decide? The judge first as a gatekeeping function, okay, because that's why we would have litigated it. And that's what the Brannon case says. Brannon is very similar. The defense in a bank robbery wanted to take photos of another bank robber and show them to the jury. And the district court said no, just as this district court. Well, what would you have done? I don't understand. You were working on this other case, okay. You've got this case. You've got this other case. And the case involves a, just as the description goes, another robbery in the neighborhood by a Hispanic woman, 5-foot tall, with bad skin. Okay. So what do you do? How do you say it gets decided by a district court in the first instance? What do you do with it? Do you say, never mind, I'm not turning it over? No, Judge. You turn it over and you say to the defense, let me draw an analogy. I've turned over tons of evidence in the past, said to a defendant. I don't want an analogy. I want you to tell me what you do with it. You turn it over and if the defense believes it's admissible. And that's what you would have done. That's what you would have done. You would have turned it over to the defense and then litigated as to whether or not it was admissible in the case. I would have turned it over and if the defense believed it was admissible, yes, and believed that it was Brady and that they were going to be permitted to waive photos of an unrelated robbery, yes. Well, let's take it from there. Presumably we're talking about now a new feature in the trial. It was not before the court in this particular case, but it's the Saudi defense. Some other dude did it, right? Yes. Isn't that what we're getting down to? Yes. All right. And there is an attempt to introduce this, these exhibits of the other bank robberies. What is your objection? And take it from there. What would the likely determination be by the trial judge once the other side tried to introduce it? Your Honor, I cite Perkins. I cite Brannan. And then I cite Perry v. Russian, which is in the Perkins case. But let me ask you about Brannan. Perkins is not a Brady case. Is that correct? No. And Brannan instead is a trial case where the issue is whether the trial court abused its discretion in declining to admit a photograph that the defendant wants to say would help him with his mistaken identity, correct? And that photograph was clearly of, as in this case, an unrelated robbery, yes. And this Court said, well, it actually would have been preferable to admit the photograph. But now on an abuse of discretion standard, we will uphold the trial court, correct? Yes. That's exactly right. So it's not a de novo Brady violation that's being looked at in Brannan. Is that correct? That is correct. And the one other case, Judge, that I also would have cited, in Perry v. Russian, which is very close, you've got two men of the same race committing assaults in the same area of Golden Gate Park within one hour of each other. They're both black, similar height and weight, and they both have, quote, sexually braided hair. And the district court excluded it because, except for the race of the man, this is a quote, there was nothing similar. Can you tell me where in the record? You said that the judge indicated that he wouldn't have admitted this and he did so only by comparing the information that was available at the time of the trial. Where is that? Judge E.R. 626. I'm looking at exactly at that. It's not at all clear to me that he's not looking at the actual photographs of Ms. Rodriguez's, I mean, the later photographs as opposed to the surveillance photographs. Where do you get that from? Okay. Judge, for one thing, if he'd been looking at the only photographs of Rodriguez Gallegos are when she's the unknown robber. Okay? And that's Exhibits 2 and 3. Is there a photograph of a photo display of her? No. It's a video. Okay. Oh, okay. I see the judge's point. If he'd been referring to the video, he would have referred to the video, but that's more the Rule 33 analysis. Okay? And that's December. So let me stay with that. If you go here, we have the discussion that it is Exhibits 2 and 3 that we are referring to. And I better find it because I know it. Oh, at 559 and 560. Let me find that. Okay. Your Honor, it's about line 15. What are Exhibits 2 and 3? They are the photographs taken from the bank robber's surveillance tape from the November 28, 2000 robbery, later identified as Ms. Gallegos. I offer those for admission. The discussion continues, and that's when you eventually get to ER 626, I hope that's the right site, where the judge says, just looking at the photographs, I see that they're markedly different. And that's where I'm getting that. Back to my earlier question, which I don't think was entirely answered. You make the objection based on the cases you mentioned. Yes. What are the probable – what are the likely rulings by – this is all hypothetical, obviously, because we're all looking backward. What are the hypothetical rulings that the judge might make at that point? The judge is then going to go to this Court's line of cases dealing with third-party liability, because this is not a case about race. The other proposition has been that somehow race also traced back. The defense attorney himself at the motions for new trial, and this is at ER 645 and 675, referred to the ambiguous ethnicity of these two women. You had Hispanic or Oriental or Asian, just for the November robber, and you had five different descriptions of the September 2000 robber. So race was just too blunt a tool. That also wasn't identifying that. I'm still listening for an answer to Judge Scanlon's question. Okay. Okay. There's an objection and there's a ruling, okay? Judges don't usually run on like this with rulings. What's the ruling? The ruling is to the defense, you will not be permitted to use this extraneous evidence of an unrelated crime because it cannot bear upon who is in the September 2000 video. And the judge would cite the three cases I've cited as he did in his order denying the new trial on Brady grounds. And the grounds would be irrelevance, lack of relevance? Would it be or what would be the grounds? It would be lack of relevance, confusing the issue, misleading the jury. Because the jury's ---- 4-3, basically. Yes. It would be a 4-3 analysis. This jury's charge was to determine whether or not Ms. Jernigan was the person in the September 2000 video. What the November 2000 ---- Okay. And as Judge Scanlon said, her defense is some other guy did it. Yes. And we know there was some other guy, looks just like me, running around the neighborhood, committing these kind of robberies. But, Judge ---- And you haven't got anything connecting me to this robbery except notifications. Well, that's not exactly true as well. There was a question before, did the FBI agent really sit down and go over these cases with his fellow agents prior to the trial? The way Ms. Jernigan got developed as a subject, this is at ER-414, was the FBI agent was talking to the postal agents. And the postal agent said, we have Ms. Jernigan shoplifting in the Gilbert area at the time of the September 2000 robbery. So, yes, they could place her there. The September 2000 robbery left on foot. This is ER-565. If you follow the direction she went, there's a hole in the fence leading to the apartment complex where Jernigan had previously lived. But if you wanted to create reasonable doubt, Jernigan was also charged with two other robberies, right? Yes. In one of the robberies, there was this vehicle that was described, right? And that vehicle is fairly similar to a vehicle that's described in one of the robberies that we know she did not commit. So if ---- Yes. And I'm not sure that the one that ---- Since the one where she has a vehicle, allegedly, that they think that she did, I don't know, was she identified by eyewitness testimony there as well, or how did they hook her to that one? Or was that just an MO one? Okay. Let me take on the ---- But I'm just saying, okay, I would try to link those two together and say, all right, you think she did this ---- you think she did the one with the vehicle, but we know she didn't do this other one with the vehicle. And if you're trying to ---- you know, if MO ties them all together, I mean, I think all that could be woven together to impeach the agent, certainly, or to impeach the theory of her guilt on all of this. First of all, Ms. Rodriguez-Gallegos is caught in an Isuzu Rodeo. That's an ER 454. She's not caught in a Toyota. Secondly, the description for the October 11th robbery refers to a black Toyota 4Runner, okay? The other one is November 30th, which is a Rodriguez robbery. That's a newer SUV Toyota. But Jordan's kind of a homeless gal, isn't she, that doesn't have a vehicle, she doesn't have a gun, she doesn't ---- you know, she's shoplifting. She did have a gun, and that was affirmed on direct appeal. She's serving a consecutive term for her bank robbery. Well, no, you didn't find her with a gun, though. No, the teller found her with a gun. I mean, you didn't have a gun in evidence. Someone said she had a gun. But what I'm saying is, when you assess the strength of your case, yes, she was convicted of having ---- whoever committed that robbery, and she was convicted of doing it, had a gun. But in assessing the strength of your case, when she was arrested, she didn't have a gun, right? Correct. She didn't have $5,000. Correct. Didn't have any money, right? So some ---- She was living on the street. I don't know how much money she had. Didn't have a car. I don't ---- well, let me just say on the car, I agree, the car was not important for the September 2000 robbery because she left on foot, and there was that evidence. There cannot be a Brady violation, though, for a dismiss count. And that's the October 11th description of the Toyota, which the October 11th description doesn't have the same color and doesn't refer to a gold trim, which is what the other description did. The question was, did the agent try to follow up? Well, I realize there can't be a Brady violation for that, but I'm just saying if I had all that information and I were defending her on that, you know, how would I weave it all together to create a reasonable doubt in the trial? How would the trial be different when ---- it's a lot different to argue mistaken identity when you don't have that video over there where, you know, some other, you know, Hispanic ---- I mean, I'm surprised I didn't get rounded up in 5-3 in Hispanic. I'm older, though. I think that the essential soundness ---- you're saying, Judge, that, well, then ---- I don't see your case as being that strong. I mean, I've seen other ---- because you don't have any evidence from the crime, you know, that you don't have ---- she's not found with a gun. She isn't found with money that might have ---- could have been marked bills. I mean, the strength of it is it all sort of piggybacks on what a number of people identify her. Judge, I've never had five eyewitnesses. Not for her, Chris. No. If I could answer that, I've never had five eyewitnesses and a video. In court, typically ---- But, you know, the problem is you're dealing with a very peculiar-looking suspect. If you line up all the bank robbers in America last year or in that particular year, you're not going to find a lot of them that look like her. So the tendency is to say, well, the idea that it could have been a mistake identity of somebody else that looks just like me doing this becomes not very plausible unless you actually have evidence that, yes, in fact, there was somebody doing it when I was sitting in that jail cell. It makes it much more plausible than alternative. The district court's ruling severing the counts was sound. And if you imagine a world where the defense changes its mind and says, no, we want to try all three that are attributed to her together, because they want to use the November 2000 robberies for anti-identity purposes, then clearly you're in a world where the other October robberies attributed to Jernigan are going to be admissible. And this Court's case law is very strong that the judge's decision that we're going to try this one robbery at a time and we're going to keep extraneous robberies out of the picture is sound and is well-supported in this Court's case law. I'm running out of time. Let me just try to take the specter of actual innocence off the table. Ms. Gallaher is very strong that two different robbers robbed her. The polygraph, if you look at the testimony by the polygrapher. Ms. Gallaher saw the first robber quite personally, and her description of the second robber is more only evolved over time to be quite different from the first one. Judge, I would dispute that. She referred to Rodriguez-Gallegos at the time as rather – at the time she was robbed as rather attractive with no facial blemishes at the – that was at the time of motion for new trial. On the day she was robbed, she said quite attractive, fair complexion. That's very, very close. She said she was 30 and later said she was 22. No, I don't think she said that. I think she referred – she might have said 30-ish, but she did not. She makes about a 10-year difference. Would you like to close, and we'll give you 10 seconds if you want. Okay. The polygraph, if you look at that, it's ER 153, 154. Ms. Jernigan lied on the control questions. It's very clear she did. That's what the polygrapher would have to have testified to. So the utility of a polygraph when you lie on the control questions – But she did not lie on the critical question. Well, that's vouching by the polygrapher, and that's why it's law of the case in this case and very strong that the polygraph would not have come in. If you lie on the control questions, that's not going to be a very persuasive polygraph. The tattoos, it's very clear, ER 121, 122, that you wouldn't have been able to see the hand because of the way the gun was positioned. And finally, the fingerprint, ER 174. What Kloops has said was, no, no, her knuckles may have touched. Her fingers didn't touch. This was well litigated at the previous trial. Thank you. Thank you. Very briefly. Yes, Your Honor. Thank you. Let me just point out, ER 473, Judge Carroll did have in front of him pictures of Rodriguez-Gallegos from the photo spread. So he did have pictures in addition to the pictures from the bank surveillance camera. With respect to the third-party liability, we obviously would have cited Crosby and Armstrong, which are cited in our brief. Crosby, in fact, is a case where Judge Carroll, in fact, had ruled out evidence of another perpetrator in a case from the Navajo Reservation. He had a link there. Pardon me? He had a link. Pardon me? You had a link in Crosby. There was a link in that this was the husband of the victim. That's correct. This was the husband of the victim, but there was no link beyond that other than that he had in the past apparently abused this particular victim. But this Court reversed Judge Carroll in excluding that third-party culpability. Finally, the clearly we could have impeached, and I think a number of you have made this point. We could have impeached the quality and the thoroughness and the good faith of the investigation by the agent in this case with the evidence of the November 28th and  But he never, never did anything to consider whether those particular two robberies were committed by the same individual who had committed the September 20th robbery. Except look at the photographs. Well, except look at the photographs, yes, but he didn't do anything else. He never even asked after the time of the trial, of course, Rodriguez-Gallegos was not known. But after the trial, he never pursued it with Rodriguez-Gallegos whatsoever. Thank you, Your Honor. The matter just argued is submitted for decision and concludes the Court's calendar for this afternoon. The Court stands adjourned.
judges: Schroeder, B. Fletcher, Pregerson, Kozinski, O'scannlain, Rymer, Silverman, McKeown, Fisher, Gould, Berzon, Bybee, Callahan, Bea, Ikuta